**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| JANICE FRANKLIN, individually and as Successor in Interest to Jason Franklin, deceased, | Case No. 1:24-cv-499 |
| *Plaintiff,* | **COMPLAINT** |
| *v.* | **DEMAND FOR JURY TRIAL** |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| *Defendant.* | |

Plaintiff Janice Franklin in her capacity as Successor in Interest to Jason Franklin, deceased, brings this Complaint and Demand for Jury Trial against Defendant the National Collegiate Athletic Association ("NCAA") to obtain redress for Jason Franklin, who was injured and died as a result of Defendant's reckless disregard for his health and safety as a student-athlete. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

## INTRODUCTION

1.　　Nearly one hundred thousand student-athletes sign up to compete in college football each year, and it's no surprise why. Football is America's sport and Jason Franklin and football players like him were raised to live and breathe the game. During football season, there are entire days of the week that millions of Americans dedicate to watching the game. On game days, hundreds of thousands of fans fill stadium seats and even more watch around the world. Before each game, these players—often mere teenagers—are riled up and told to do whatever it takes to win and, when playing, are motivated to do whatever it takes to keep going.

2.　　However, for years Defendant has kept players like Jason Franklin and the public in the dark about an epidemic that was slowly killing college athletes—and then, as the epidemic

barely began to come to light, failed to take adequate steps to manage it.

3.    During the course of a college football season, athletes absorb hundreds of impacts greater than 10 Gs (gravitational force) and, worse yet, the majority of football-related hits to the head exceed 20 Gs, with some approaching 100 Gs. To put this in perspective, if you drove your car into a wall at twenty-five miles per hour and weren't wearing a seatbelt, the force of you hitting the windshield would be around 100 Gs. Thus, each season these 18, 19, 20, and 21-year-old student-athletes are subjected to repeated car accidents.

4.    Over time, the repetitive and violent impacts to players' heads led to repeated concussions that severely increased their risks of long-term brain injuries, including memory loss, dementia, cognitive impairment, Chronic Traumatic Encephalopathy ("CTE"), Parkinson's disease, and more. Meaning, long after they played their last game, they are left with a series of neurological conditions that could slowly strangle their brains.

5.    For decades, Defendant knew about the debilitating long-term dangers of concussions, concussion-related injuries, and sub-concussive injuries that resulted from playing college football, but recklessly disregarded this information to protect the very profitable business of "amateur" college football.

6.    While in school at Arizona State University ("ASU"), football players like Jason Franklin are ultimately under Defendant's care. Unfortunately, Defendant did not care about the off-field consequences that would haunt students, like Jason Franklin, for the rest of their lives.

7.    Despite knowing for decades of a vast body of scientific research describing the danger of concussive and sub-concussive impacts like those Jason Franklin experienced, Defendant failed to implement adequate procedures to protect Franklin from the long-term dangers associated with them. It did so knowingly and for profit.

8.    As a direct result of Defendant's acts and omissions, Jason Franklin suffered brain and other neurocognitive injuries from playing NCAA football, culminating in his tragic suicide by hanging at age 26. Post-mortem testing performed on his brain confirmed that he suffered from Stage II CTE.

9.      As such, Plaintiff brings this Complaint in order to vindicate Franklin's rights and hold the NCAA accountable for its acts and omissions.

**PARTIES**

10.      Plaintiff Janice Franklin brings this action as Successor in Interest to Jason Franklin, who is deceased. Janice Franklin is a citizen of the State of California, and Jason Franklin was a citizen of California when he died.

11.      Defendant NCAA is an unincorporated association with its principal place of business located at 700 West Washington Street, Indianapolis, Indiana 46206. Defendant NCAA is not organized under the laws of any State, but is registered as a tax-exempt organization with the Internal Revenue Service. As such, Defendant NCAA is a citizen of Indiana pursuant to 28 U.S.C. § 1332(d)(10).

**JURISDICTION AND VENUE**

12.      This This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 in that the jurisdictional amount exceeds $75,000, Plaintiff is a citizen of California, and the NCAA is a citizen of Indiana.

13.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in and/or emanated from this District, and because Defendant NCAA resides here.

**FACTUAL BACKGROUND**

**I.    Defendant Had a Duty to Protect Student-Athletes, Including Jason Franklin.**

14.      The NCAA is the governing body of collegiate athletics that oversees twenty-three college sports and over 400,000 students who participate in intercollegiate athletics, including the football program at ASU. According to the NCAA, "[m]ore than 1,200 schools, conferences and affiliate organizations collectively invest in improving the experiences of athletes—on the field, in the classroom, and in life."

15.    The NCAA brings in more than $750 million in revenue each year, and is the most significant college sports-governing body in the United States.

16.    To accommodate the wide spectrum of athletes at its member schools, the NCAA has three different divisions of intercollegiate competition.

17.    Each NCAA division is composed of several "conferences" to facilitate regional league play.

18.    ASU currently has a NCAA Division I football program in the Pac-12 conference.

19.    The ASU football program has a strong following that generates millions of dollars per year for the school. Given its significant following and numerous on-field successes, the ASU football team attracts high-end talent from high schools across the country. Well over 100 former ASU players have been drafted to play professional football in the National Football League ("NFL").

20.    Defendant plays a significant role in governing and regulating the ASU football program and owes a duty to safeguard the well-being of ASU's student-athletes.

21.    Since its founding in 1906, the NCAA (then the Intercollegiate Athletic Association of the United States ("IAAUS")), has claimed to be "dedicated to safeguarding the well-being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and throughout life."[1] The IAAUS was specifically formed for this purpose because, at the turn of the twentieth century, head injuries were occurring at an alarming rate in college football. In response, President Theodore Roosevelt convened a group of Ivy League university presidents and coaches to discuss how the game could be made safer. After several subsequent meetings of colleges, the NCAA was established.[2]

22.    As such, the genesis of the NCAA was for a singular goal: "to keep college

---

[1]    *Who We Are*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/about/who-we-are (last visited March 18, 2024).

[2]    In 1910, the IAAUS changed its name to the National Collegiate Athletic Association.

athletes safe."[3]

23.     According to the NCAA, "[c]ollege and university presidents and chancellors guide each division, supported by an extensive committee structure guided by athletic administrators, faculty and student-athlete representatives [while each] division creates its own rules that follow the overarching principles of the NCAA."[4]

24.     The overarching principles of the NCAA, including its purported commitment to safeguarding its athletes, are contained in the NCAA Constitution. The NCAA Constitution clearly defines the NCAA's purpose and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and athletes. The NCAA Constitution states:

The purposes of this Association are:

(a)   To initiate, stimulate and improve intercollegiate athletics programs for athletes;

(b)   To uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;

NCAA Const., Art. 1, § 1.2(a)(b).

25.     The NCAA Constitution also defines one of its "Fundamental Policies" as the requirement that "[m]ember institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation." *Id.* § 1.3.2.

26.     Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides:

**2.2 The Principle of Student-Athlete Well-Being.**

Intercollegiate athletics programs shall be conducted in a manner

---

[3]      *Well-Being*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/health-and-safety (last visited March 18, 2024).
[4]      *Membership*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/about/who-we-are/membership (last visited March 18, 2024).

designed to protect and enhance the physical and educational well-being of student athletes. (Revised: 11/21/05.)

**2.2.3 Health and Safety.**

It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student athletes. (Adopted: 1/10/95.)

27.    To accomplish this purpose, the NCAA promulgates and implements standard sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. These NCAA documents provide detailed instructions on game and practice rules, player eligibility, scholarships, and player well-being and safety. Both NCAA member institutions, including ASU, and NCAA conferences are obligated to abide by the NCAA's rules and requirements. Specifically, according to the NCAA Constitution: "Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs . . . Members of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance." NCAA Const., Art. 2, § 2.8.1.

28.    The NCAA publishes a health and safety guide termed the Sports Medicine Handbook (the "Handbook"). The Handbook, which is produced annually, includes the NCAA's official policies and guidelines for the treatment and prevention of sports-related injuries, as well as return-to-play guidelines, and recognizes that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation."[5]

29.    The NCAA, therefore, holds itself out as both a proponent of and authority on the

---

[5]    John T. Parsons, *2014-15 NCAA Sports Med. Handbook*, Nat'l Collegiate Athletic Ass'n (Aug. 2014), https://www.ncaapublications.com/productdownloads/MD15.pdf#page=5.

treatment and prevention of sports-related injuries upon which NCAA athletes, including Jason Franklin during his life, as well as schools like ASU, could rely for guidance on player-safety issues.

30.     Jason Franklin relied upon the NCAA's authority and guidance to protect his health and safety by treating and preventing head-related injuries, including the effects of those head injuries later on in his life.

31.     As compared to Jason Franklin and other ASU football players, the NCAA was in a superior position to know of and mitigate the risks of sustaining concussions and other TBIs while playing football at ASU. It failed to do so.

## II.    Decades of Studies Firmly Establish the Dangers of Football-Related Concussions.

32.     Throughout the twentieth century and into the twenty-first century, studies have firmly established that repetitive and violent impacts to the head can cause concussions and TBIs, with a heightened risk of long-term injuries and impacts, including—but not limited to— memory loss, dementia, depression, Alzheimer's disease, Parkinson's disease, and CTE.

33.     Such violent impacts to the head are a one-way street for those who experience them. As Jonathan J. Russin—Assistant Surgical Director at the USC Neurorestoration Center at the Keck School of Medicine—has stated, "there's no way to undo a traumatic brain injury," and one's "best bet is to avoid concussions altogether."[6]

34.     To better understand the results of these studies, a brief introduction to concussions in football follows.

### A.    An Overview of Concussions in Football.

35.     A TBI is an injury to the brain that comes as the result of the application of either external physical force or rapid acceleration and deceleration forces, which disrupts brain function in a manner that causes impairments in cognitive and/or physical function.

36.     A concussion is a TBI initiated by an impact to the head, which causes the head

---

[6]     Deanna Pai, *Do Concussions Increase the Risk of Stroke or Brain Cancer?*, Keck Sch. of Med. at USC, https://bit.ly/2MzSkkC (last visited Sept. 18, 2018).

and brain to move rapidly back and forth. The movement causes the brain to bounce around or twist within the skull, damaging brain cells and leading to harmful chemical changes in the brain.

37.     The human brain is made of soft tissue, cushioned by spinal fluid, and encased in a hard skull. During everyday activity, the spinal fluid protects the brain from crashing against the skull. But relatively minor impacts—including not only direct blows to the head, but also blows to the body and movements that cause the neck to whiplash—can move the brain enough to press through the spinal fluid, knock against the inside of the skull, and cause concussions.

38.     Concussions typically occur when linear and rotational accelerations impact the brain, through either direct impact to the head or indirect impacts that whiplash the head. During the course of a college football season, studies have shown that athletes can receive more than 1,000 impacts greater than 10 Gs. This is slightly more force than a fighter pilot receives from performing maximal maneuvers. The majority of football-related hits to the head exceed 20 Gs, with some going well over 100 Gs.

i.     *Concussion Symptoms.*

39.     When a collegiate athlete suffers a severe impact to the head, he may experience concussion-related symptoms, including:

- "seeing stars" and feeling dazed, dizzy, or lightheaded;

- memory loss;

- nausea or vomiting;

- headaches;

- blurred vision and sensitivity to light;

- slurred speech or saying things that do not make sense;

- difficulty concentrating, thinking, or making decisions;

- difficulty with coordination or balance;

- feeling anxious or irritable for no apparent reason; and

- feeling overly tired.

40.     A collegiate athlete may not recognize the signs and/or symptoms of a

concussion, and, more often, the effect of the concussion itself prevents him from recognizing them. Because of that, he may put himself at risk of further injury by returning to a game after a concussion. Brains that have not had time to properly heal from a concussion are particularly susceptible to further injury.

ii.    *Post-Concussion Treatment*.

41.    After a concussion, the brain needs time to heal. Doctors generally prohibit individuals from returning to normal activities—certainly including contact sports—until all symptoms have subsided. They do so because immediately after a concussion, the brain is particularly vulnerable to further injury. Even after the immediate effects have worn off, a person who has suffered a concussion is four to six times more likely to receive another concussion than a person who has been concussion-free.

42.    The length of the healing process varies from person to person and from concussion to concussion. Symptoms may even last for one or two weeks.

43.    Individuals who do not recover from a concussion within a few weeks are diagnosed with post-concussion syndrome. The symptoms of post-concussion syndrome can last for months, and sometimes can even be permanent. Generally, people suffering from post-concussion syndrome are referred to specialists for additional medical help.

44.    Still, many people think of concussions as short-term, temporary injuries. However, decades of scientific research demonstrate the effects of concussions are anything but temporary.

**B.    Studies Confirm the Dangers and Long-Term Effects of Concussions.**

45.    Two of the leading studies on the long-term effects of concussions were conducted by Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute. These studies showed the "devastating consequences" of repeated concussions, including that they lead to an increased risk of depression, dementia, and suicide. These studies have also demonstrated that repeated concussions trigger progressive degeneration of the brain tissue, including the build-up of an abnormal protein called the "tau

protein."

46.     Between 2002 and 2007, Dr. Bennett Omalu of the Brain Injury Research Institute examined the brains of five former NFL players: Andre Waters, Mike Webster, Terry Long, Justin Strzelczyk, and Damien Nash. Waters killed himself; Nash died unexpectedly at the age of 24; Webster, homeless and cognitively impaired, died of heart failure; and Strzelczyk died driving the wrong way down a highway at 90 miles per hour. Four of the five brains showed the telltale characteristics of CTE—a progressive, degenerative disease of the brain found in people with a history of repetitive brain trauma.

47.     In his early studies, Dr. Robert Cantu of the Boston University Center for the Study of Traumatic Encephalopathy found evidence of CTE in 90 of 94 (96%) autopsied brains of former NFL players. A recent update to these studies found CTE in a staggering 110 of 111 (99%) former NFL players and 48 of 53 former college players (91%).[7]

48.     These more recent studies were neither aberrations nor surprises but confirmations of what was already known or readily apparent from the existing medical literature.

49.     Studies like these, which establish the devastating dangers related to TBIs, date back to the early twentieth century. For example, in an article in the 1905 multi-volume medical text *A System of Medicine*, surgeon Sir William Bennett noted that the dangers from TBIs can arise just as easily when "no loss of consciousness occurs at all," and that such injuries "may in the end have far graver results" due to their "escap[ing] treatment altogether in the first instance" given their less severe appearance.[8] Bennett noted that the imposition of a strict treatment regimen immediately after an injury, during initial recovery, and following the initial recovery period, was essential to the "treatment of all cases of concussion of the brain, whether they be

---

[7]     Jesse Mez, MD, MS, et al., *Clinicopathological Evaluation of Chronic Traumatic Encephalopathy in Players of Am. Football*, 318 JAMA 4, 360–370 (2017).
[8]     Sir William Bennett, *Some Milder Forms of Concussion of the Brain*, A System of Med., Vol. 8 231-32 (2d ed. 1910).

severe or slight."[9]

50.     Some early articles from this period began to recognize the unique dangers presented by football, specifically. The editors of the *Journal of the American Medical Association* recognized the long-term risks of such head injuries very early on, writing in 1905 that "[t]o be a cripple or lunatic for life is paying high for athletic emulation" via football.[10] Similarly, the risks of concussions in football were discussed in a 1906 article by Dr. Edward Nichols, who observed that a concussed player might go through multiple plays before his teammates noticed his altered mental state.[11]

51.     Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science began to clearly recognize the debilitating effects of concussions and other TBIs, connect it to contact sports (including football) and find that repetitive head impacts can cause permanent brain damage and increased risk of long-term cognitive decline and disability.

52.     For instance, in 1927, Drs. Michael Osnato and Vincent Giliberti discussed a disease they called traumatic encephalitis in an article on post-concussion damage in *Archives of Neurology & Psychiatry*, concluding that brain disease could manifest in "young men knocked out in football and other games," but noting that the issue had "not received adequate attention."[12] Then, in 1928, Pathologist Dr. Harrison Martland published a study called "Punch Drunk" in the *Journal of the American Medical Association*, where he described the clinical spectrum of abnormalities found in nearly 50 percent of boxers who had been knocked out or who had suffered a considerable impact to the head.[13]

53.     Countless studies were later conducted on boxers suffering chronic neurological symptoms as a result of repeated head injuries, and who displayed signs of dementia and

[9]      *Id.*
[10]     Editors, *The Football Mortality*, 39 JAMA 1464 (1905).
[11]     Edward Nichols, *The Physical Aspect of Am. Football*, 154 Bos. Med. & Surgical J.1 (1906).
[12]     Michael Osnato & Vincent Giliberti, *Postconcussion Neurosis-Traumatic Encephalitis*, 18 Archives of Neurology & Psychiatry 181 (1927).
[13]     Dr. Harrison S. Martland, *Punch Drunk*, 91 JAMA 1103 (1928).

impairment of motor functions.[14] As incidents of chronic encephalopathy increased, they were often characterized as a "Parkinsonian" pattern of progressive decline. However, in a chapter of a mid-twentieth century book on brain injuries, psychiatrists Karl M. Bowman and Abram Blau coined the term "chronic traumatic encephalopathy" to explain the deterioration of a boxer's mental state over time.[15]

54.     In 1936, Dr. Edward J. Carroll, Jr. wrote an article further recognizing "punch-drunk syndrome's" seriousness, stating that "no head blow is taken with impunity, and [] each knock-out causes definite and irreparable damage. If such trauma is repeated for a long enough period, it is inevitable that nerve cell insufficiency will develop ultimately, and the individual will become punch-drunk." He also noted that in addition to boxers, punch drunk had been recognized among football players.[16]

55.     The next year, the American Football Coaches Association published a report warning that players who suffer even "one concussion" should be removed from play.[17]

56.     In 1952, an article published in *The New England Journal of Medicine* first recommended a "three-strike rule" for concussions in football, demanding that players cease to play football permanently after receiving their third concussion.[18]

57.     Starting in the late 1960s, the medical community began focusing on the effects of concussion-related injuries in football. In a 1967 study, Drs. John R. Hughes and D. Eugene

---

[14]     *See, e.g.*, E. Guttmann & C.E. Winterstein, *Disturbances of Consciousness After Head Injuries: Observations on Boxers*, 84 J. of Mental Sci. 347 (Mar. 1938); Harry L. Parker, *Traumatic Encephalopathy ('Punch Drunk') of Professional Pugilists*, 15 J. of Neurology & Psychopathology 20 (July 1934); C.E. Winterstein, *Head Injuries Attributable to Boxing*, 2 Lancet 719 (Sept. 1937).

[15]     K.M. Bowman & A. Blau, *Psychotic States Following Head and Brain Injury in Adults and Children*, Injuries of the Skull, Brain and Spinal Cord: Neuropsychiatric, Surgical, and Medico-Legal Aspects 309 (S. Brock, ed. 1940).

[16]     Edward J. Carroll, Jr., *Punch-Drunk*, 191 Am. J. Med. Sci. 706 (1936).

[17]     Proceedings of the Seventeenth Annual Meeting of the American Football Coaches Association (Dec. 29, 1937) ("Sports demanding personal contact should be eliminated after an individual has suffered a concussion").

[18]     Augustus Thorndike, *Serious Recurrent Injuries of Athletes—Contraindications to Further Competitive Participation*, 247 New Eng. J. Med. 554, 555-56 (1952).

Hendrix examined how severe impacts affected brain activity in football players by utilizing electroencephalograms ("EEGs").[19] Several years after that, a potentially fatal condition known as "Second Impact Syndrome" was identified, which is a re-injury to an already-concussed brain that triggers swelling the skull cannot accommodate.

58.    In 1975, the Chief Medical Officer of the British Boxing Board of Control suggested boxers were not the only persons or athletes vulnerable to the risk of long-term brain injuries, stating:

> Irreversible brain damage caused by regular excessive punching can cause a boxer to become punch drunk, a condition known euphemistically in medical terms as [Chronic] Traumatic Encephalopathy. The condition can be caused by other hazards of contact sports—taking too many falls while hunting or steep chasing or the continual use of brute force rather than skill in the rugby field or heading a football incessantly over many years. **Anything which entails intermittent trauma to the head can cause it.**[20]

59.    Overall, countless studies—published in prominent medical journals such as the *Journal of the American Medical Association*, *Neurology*, *The New England Journal of Medicine*, and *Lancet*—warned of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions and head injuries. These studies collectively established that:

- repetitive head trauma in contact sports, including football, has potentially dangerous long-term effects on brain function;

- traumatic encephalopathy (dementia pugilistica) is caused by repeated sub-concussive and concussive blows to the head;

- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the axons (brain cells) in the brainstem;

- with respect to head injuries in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

- immediate retrograde memory issues occur following

---

[19]    John R. Hughes & D. Eugene Hendrix, *Telemetered EEG From A Football Player In Action*, 24 Electroencephalography & Clinical Neurophysiology 183 (1968).

[20]    J.W. Graham, *Eight, Nine, Out! Fifty Years as Boxer's Doctor*, 56 (1975).

concussions;

- head injuries require recovery time without risk of subjection to further injury;

- a football player who suffers a concussion requires significant rest before being subjected to further contact; and

- minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

60.    As a result of these studies, medical professionals began recommending changes to the game of football and how concussion-related injuries should be handled.

61.    By 1991, Dr. Robert Cantu, the American Academy of Neurology, and the Colorado Medical Society had developed return-to-play criteria for football players suspected of sustained head injuries.

62.    In 2003, an NCAA concussion study concluded that football players who had previously sustained a concussion were more likely to have future concussion injuries. Another 2003 NCAA concussion study concluded that collegiate football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after [a] concussion," and that concussions are "followed by a complex cascade of ionic, metabolic, and physiological events that can adversely affect cerebral function for several days to weeks."[21]

63.    Following these studies, in 2004, the National Athletic Trainers' Association published a position statement, recommending baseline cognitive and postural-stability testing, as well as return-to-play recommendations, including holding out athletes who exhibit symptoms of a suspected head injury.

64.    Building upon that, a convention of neurological experts met in Prague in 2004 with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports, based on the most

---

[21]    Michael McCrea, et al., *Acute Effects and Recovery Time Following Concussion in Collegiate Football Players, The NCAA Concussion Study*, The Journal of the Am. Med. Ass'n (November 19, 2003), http://jama.jamanetwork.com/article.aspx?articleid=197668.

up-to-date research. These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

65.    Ultimately, while the NCAA knew of the harmful effects of TBIs (and other head injuries) on athletes for decades, it ignored these facts and failed to institute any meaningful methods of warning and/or protecting the athletes, including Jason Franklin. For the NCAA, the continued expansion and operation of college football was simply too profitable to put at risk.

### III.    The NCAA Ignores the Dangers of Concussions and Fails to Implement Adequate Concussion Management Protocols and Requirements.

66.    For decades, the NCAA has been aware—through institutional knowledge, research, and current medical science, among other sources of information—that severe and/or repeated head impacts can lead to long-term brain injuries, including memory loss, dementia, depression, and CTE. Unfortunately, while Defendant knew about the harmful and devastating effects of these sub-concussive and concussive injuries, it recklessly ignored these facts and failed to implement reasonable concussion management protocols to protect its athletes, including Jason Franklin.

67.    But as to college football, including ASU's football program, the NCAA continued to govern, support, and profit from the sport without disclosing what it knew to student-athletes, including Jason Franklin.

### A.    NCAA Fails to Adopt Any Concussion Protocols for Decades.

68.    Since at least 1933, the NCAA has known of the serious nature of concussions and other head injuries in college football, and even recognized the need for appropriate concussion management protocols. In its 1933 Sports Medicine Handbook—which it distributed to all member institutions—the NCAA specifically recognized that head injuries warrant special attention and should not be regarded lightly.

69.    The 1933 Sports Medicine Handbook then provided information for school and college doctors, coaches, and trainers to identify the signs and symptoms of concussions, as well as methods to be used on the sidelines for treating them. It discussed head injuries, stating that

they "are in a category by themselves and warrant special attention," as they "may be, and often are more severe in their immediate and remote consequences" than other injuries. Notably, the 1933 Sports Medicine Handbook recommended that, when concussion-related symptoms lasted longer than two days, players should "not be permitted to compete for 21 days or longer, if at all." It also stated, "[t]here is definitely a condition described as 'punch drunk' and often recurrent concussion cases in football and boxing demonstrate this," and that "[a]ny individual who is knocked unconscious repeatedly on slight provocation should be forbidden to play body-contact sport."

70.    The NCAA recognizes that its Handbook "may constitute some evidence of the legal standard of care," and has publicly recognized its duty and moral obligation to protect collegiate athletes. As NCAA President Mark Emmert testified to the Senate Commerce Committee in January 2014, "I will unequivocally state we have a clear moral obligation to make sure we do everything we can to protect and support student-athletes."

71.    Indeed, in the September 1968 issue of NCAA News, the NCAA published an article entitled *Dangers of Grid Head Injuries Cited by Safeguards Committee.* In the article, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sport issued a statement on the dangers of repeated head injuries in football, stating:

> [T]hose individuals who have been rendered unconscious, even momentarily, in a given game should never be allowed to play again in the same game and not allowed to return to contact until all symptoms have cleared up entirely and he has been checked by a competent medical authority.

72.    Rather than inform Jason Franklin of these risks or implement protocols to protect and safeguard him from TBI-related injuries (as the NCAA and ASU promised to do through the NCAA Constitution, among other things), Defendant failed to meaningfully adopt or enforce the internationally accepted guidelines regarding concussion management and return to play protocols until 2010.

73.    It was not until April 2010, under mounting public pressure, that the NCAA made some changes to its concussion treatment protocols, this time enacting a new policy that required

its member institutions to have a Concussion Management Plan ("CMP") in place for all sports. However, these changes were little more than a gesture that the NCAA had no plans to enforce, and were grossly insufficient for the purpose of protecting Jason Franklin and football players like him. Similarly, ASU adopted a variation of a CMP that was grossly insufficient, overly vague, and well short of what was necessary to educate and protect Jason Franklin (and players like him) from the risks of concussive and sub-concussive blows to the head.

74.     Defendant's paltry efforts failed: Jason Franklin received at least four preventable concussions at ASU, developed CTE, and ultimately committed suicide following a mental breakdown caused by his concussions and repetitive sub-concussive impacts.

**B.    The NCAA Adopts New, Deeply Flawed Concussion Requirements.**

75.     On April 29, 2010, the NCAA adopted a "Concussion Policy and Legislation," to be effective as of August 2010 (*i.e.,* approximately the beginning of the Fall 2010 college football season).

76.     The 2010 Concussion Management Protocol Rule ("2010 CMP Rule"), found at NCAA Bylaw 3.2.4.20, required active NCAA member institutions to develop a concussion management protocol ("CMP") that included the following: (a) an annual education process on concussions for athletes that requires athletes to acknowledge receiving information about the signs and symptoms of concussions; (b) a process that "ensures" students who exhibit concussion symptoms are removed from athletics and evaluated by a medical professional; (c) a policy precluding immediate return-to-play for concussed athletes for "at least the remainder of that calendar day"; and (d) a policy requiring medical clearance by a physician for a concussed athlete to return to athletics.

77.     Further, and importantly, under this new policy, member schools were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions."

78.     Finally, the policy required students to sign a statement "in which they accept the

responsibility for reporting their injuries and illnesses, including signs and symptoms of a concussion" to medical staff and noted that students would be provided educational materials on concussions during the signing process.

79.     The NCAA's requirements in the 2010 CMP Rule were flawed from the outset: due to the very nature of concussions, athletes suffering concussive injuries are in no position to police themselves or to give informed consent about whether to continue playing. For example, the types of questions used to screen players for concussions include "What's your name?", "What year is it?", and "What sport are we playing?". These types of questions are used for screening precisely because players experiencing concussions routinely fail to answer them correctly, despite their very elementary nature. Following logically on that, a player who cannot state his or her own name is in no condition to make an informed decision about whether or not to continue playing, and is entirely dependent on others, such as the NCAA, to identify concussive injuries in real-time and take appropriate remedial actions.

80.     Documents distributed by the NCAA to member institutions regarding concussions were flawed, too. For example, both in 2010 and *to this day*, the NCAA "Best Practices" manual on the "Diagnosis and Management of Sport-Related Concussion"—or similar documents published by the NCAA for its member institutions and the public—cited at least six articles co-authored by Kevin Guskiewicz, who served as chancellor for the University of North Carolina at Chapel Hill ("UNC"), but previously conducted significant research on traumatic brain injury at UNC. However, a 2019 review of studies co-authored by Guskiewicz found that his work contained deeply problematic omissions, including a failure to disclose that his student-athlete populations had significantly high rates of learning disorders, ADHD, and/or ADHD-related stimulant use. Worse, Guskiewicz had repeatedly failed to disclose significant conflicts of interest he held, given his work for and with entities like the NFL and the NCAA.[22]

---

[22]     See Christian Red, Failure to Disclose: *The Mysterious Absence of Critical Data from UNC's Renowned Concussion Research*, THE ATHLETIC (Oct. 8, 2019), https://bit.ly/31YKZTN; Ted Tatos & Don Comrie, *Cognitive Deficits and LD/ADHD Among College Football Athletes and Undisclosed Inclusion in Concussion Research*, 1 J. Sci. Practice & Integrity (June 2019).

81.    Finally, many of the omissions of the pre-2010 era remained with the imposition of the 2010 CMP Rule. For example, the NCAA:

- continued to fail to warn student-athletes, including football players like Jason Franklin, about any of the risks of repetitive sub-concussive injury;

- continued to fail to disclose all of the potential long-term risks of a concussion, instead continuing to present a concussion as a one-time, short-term event that one will recover from with the correct treatment;

- continued to fail to warn student-athletes that the football helmets they were using were not designed to prevent concussions, nor were designed or tested for their ability to prevent the transfer of rotational accelerative forces, *i.e.,* the key forces that cause concussion and other forms of head injury; and

- continued to allow "scout team" players to effectively serve as punching bags for member institutions' first-string offensive and defensive squads, without additional preparation for, attention to, or protection from the special risks they incur.

82.    Even so, with the 2010 CMP Rule the NCAA at least appeared to take a concrete step towards recognizing the seriousness of head injuries in football. Or so it seemed.

83.    Behind its facade of concern, the NCAA never seriously intended the 2010 CMP Rule to have force. As the NCAA's director of enforcement stated after the 2010 CMP Rule's adoption, the rule was specifically "not about enforcing whether or not [schools] were following their [concussion management] plan."[23]

84.    Indeed, during a civil lawsuit by former NCAA football players, former NCAA official David Klossner admitted this during a deposition:

> *Q: Are member institutions required to submit their concussion*
> *management plans to the NCAA?*
>
> *A: No.*
>
> *Q: Is there any oversight by NCAA that would confirm whether or not a*

---

[23]    Nathan Fenno, *Internal NCAA Emails Raise Questions About Concussion Policy*, WASH. TIMES (July 20, 2013), https://cite.law/27V8-ASKT.

*school has a concussion management plan?*

*A: No. [Klossner initiates discussion on meaning of oversight]*

*Q: Have any member schools been disciplined regarding concussion management plans?*

*A: Not to my knowledge.*

*Q: Has the NCAA considered disciplining institutions regarding concussion management plans?*

*A: No, not to my knowledge.*

85.    Thus, the NCAA's approach to enforcing its own 2010 CMP Rule was non-existent, rendering it useless and toothless. On balance, between 2010 and 2015, the NCAA tried its hardest *not* to impose significant restrictions or penalties on violating member institutions—promoting itself as a protector of student-athletes in public, but doing virtually nothing in private.

86.    It was in this context that the NCAA purportedly agreed to strengthen its CMP requirements as part of a 2014 settlement in *Arrington, et al. v. NCAA*, a lawsuit brought by former NCAA football players against the NCAA over its treatment of concussions.[24] As part of the settlement, the NCAA agreed to, among other things, institute a series of enforceable rule changes purportedly aimed at preventing and/or limiting concussions and their negative impacts.

87.    As such, in 2015 the NCAA rolled out new CMP requirements, embodied at NCAA Bylaw 3.2.4.18.1 (hereafter "the 2015 CMP Rule"). The 2015 CMP Rule required, among other things, that NCAA member institutions adopt a CMP that provided for, at minimum: (a) preseason baseline testing for all athletes, (b) prohibitions on return-to-play on the day of diagnosed concussions for all athletes, (c) the presence of medical personnel at all games, (d) the implementation of concussion tracking guidelines, (e) the provision of concussion education before the start of each athletic season, (f) procedures for "return-to-learn," *i.e.*, returning to academics after experiencing a concussion, and (g) a process for annually reviewing

---

[24]    Ben Strauss, *N.C.A.A. Deal Revamps Head-Injury Care*, N.Y. TIMES (July 29, 2014), https://nyti.ms/2xwQFcN.

each school's CMP.

88.     As a part of the 2015 CMP Rule and other concussion-related efforts, the NCAA also now required each member institution to submit its CMP to the NCAA annually for approval. The NCAA established a Concussion Safety Protocol Committee that would be responsible for reviewing and approving (or rejecting) each member institution's CMP.

89.     However, it is not clear whether this Committee is empowered to bring violating schools into compliance—and if it is so empowered, whether it has actually rejected any school's CMP, or penalized a school for non-compliance.

90.     Other efforts by the NCAA have similarly fallen short. For example, even as the NCAA came out with *guidelines* recommending that member institutions take various actions to increase player safety—such as by limiting full-contact practices—it refused to give these recommendations the force of *rules*, making them unenforceable, toothless suggestions that did nothing.

91.     In sum: the NCAA was caught doing virtually nothing regarding the risks of concussions and repetitive sub-concussive hits it knew plagued the sport of football; effectuated minor, virtually unenforceable changes to its rules as a head-fake towards real action; and then, four years later and *only* upon being sued, took additional small steps towards action. But at no point did it do what it should have done from the beginning—implement a comprehensive CMP applicable all member institutions' football programs with real, clear mechanisms for enforcement and adequate penalties for non-compliant schools.

**C.     ASU Adopts a Deeply Flawed, Ineffective CMP.**

92.     During this period, ASU hardly did much better than the NCAA. Despite the NCAA's implementation of the 2010 CMP Rule, ASU continued to follow a concussion management regime that was deeply flawed, ineffective, and a direct contributor to Jason Franklin's eventual development of CTE and death.

93.     In 2011, ASU implemented a CMP codified as Student Services Manual 1201-05 ("SSM 1201-05"). This policy purports to "improve the safety of ASU students" in sports with

"a high risk of [concussion]."[25]

94.    SSM 1201-05 requires students to "sign a statement" that "recognizes the risk for [concussion] and accepts the responsibility for injuries that occur during participation in" a given sport. It also requires any student exhibiting concussion symptoms to "be removed from practice or competition" and evaluated by a "sports medicine provider with experience in" concussion management. It also mandates some generic concussion education requirements.

95.    While this policy was, on the surface, an attempt to implement the NCAA's 2010 CMP Rule—which was itself inadequate, recall—the policy leaves much to be desired. Notably, the policy fails to mention the risks of repetitive sub-concussive injury at all, and fails to mention any of the potential *long-term* risks of a concussion. Such a policy would not have effectively warned ASU players (including Jason Franklin) about the risks inherent in playing football at ASU.

96.    Worse, ASU's CMP did not require players who sustained a concussion during a game to be removed from play for the remainder of the game, at minimum.[26]

97.    Worse still, public information shows that the already deficient SSM 1201-05 had a rocky rollout, at best. For example, a 2019 study of ASU athletes (including non-football players) found that "student athletes tend to say that educational materials [on concussions] are not memorable," and information about the risks of concussions are infrequently provided and surface-level.[27]

98.    ASU could certainly have required football players like and including Jason Franklin to undergo more intensive education about concussions, but the NCAA did nothing to ensure that it would.

---

[25]    *See* Ariz. State University SSM 1201-05, available at https://bit.ly/2mePj1f (last accessed Sept. 17, 2019).
[26]    *See* Jason Segall, *How Long Should a Player Sit Out After Getting a Head Injury*, HEAD INJURIES IN FOOTBALL (Apr. 12, 2013), https://cite.law/56MG-T6WC.
[27]    *See* Steven R. Corman, et al., *Socioecological Influences on Concussion Reporting by NCAA Division 1 Athletes in High-Risk Sports*, PLOS ONE, at 13 (2019).

## FACTS SPECIFIC TO JASON FRANKLIN

99.     Jason Franklin was born on May 6, 1992 in Simi Valley, California. Up until the final year of his life, Jason was a talkative, social young man with a bright future.

100.     During high school, Jason attended Chaminade College Preparatory School in Los Angeles, California. He played football all four years of high school, and was a three-year varsity starter on the football team.

101.     Beginning in his senior year of high school, Jason began the process of considering and applying to various colleges. Among other considerations, Jason wanted to attend a school where he could continue playing football. He applied to a number schools and was accepted by several, including Valparaiso University (where he was offered a full scholarship to play football), Duke University, Colombia University, University of Missouri, and University of Colorado – Boulder. Each school offered Jason the opportunity to play football, either directly or as a preferred walk-on (*i.e.,* he would still have to try out for the team, but be given preferred status). He visited Valparaiso, Duke, and Colombia in anticipation of accepting one of their offers.

102.     Jason also applied to ASU—however, because ASU did not initially recruit Jason for their football team or offer him a walk-on opportunity, he did not strongly consider attending.

103.     This changed in early 2011 when Trent Bray, then ASU's linebacker coach, saw a video of Jason's high school football highlights on the Internet. Bray then called Jason directly and strongly encouraged him to reconsider coming to ASU. Bray assured Jason that he would be treated as a preferred walk-on if he agreed to attend. Later, Bray invited Jason and his family to come to ASU, which they did. The family met with ASU's coaching staff during this visit.

104.     Ultimately, based entirely on Bray's outreach and promise to give him preferred walk-on status, Jason decided to attend ASU despite a lack of a scholarship offer.

105.     That summer, he tried out for the football team and was accepted, and started school at ASU that fall. Prior to playing football, ASU administered "baseline testing" to Jason,

or an assessment of his pre-collegiate football neuropsychological functioning. He received a score of zero on that testing, indicating an absence of neuropsychological symptoms.

106.    During his time playing football at ASU, Jason Franklin suffered multiple concussions. He was also subjected to countless sub-concussive hits as a part of practice and gameplay.

107.    In particular, as a member of ASU's "scout team" Jason was often used as a punching bag for bigger, stronger first-string players. For example, early on at ASU, Jason was required to participate in a practice drill in which two players run at each other and try to tackle the other to the ground. In one drill, he was put up against then-senior ASU player Vontaze Burfict. (Burfict later played as a linebacker for the Oakland Raiders, and was a notoriously hard-hitter who in 2019 was suspended for 12 games over a helmet-to-helmet hit.[28]) Burfict hit Jason so hard that he flew into the air, ultimately hitting his head on the ground.

108.    In December 2012, Jason received a concussion during practice and reported it to his team physician.

109.    In August 2014, Jason received another concussion during practice, which he reported to his team doctor and coach.

110.    In early September 2014—with two concussions already under his belt—Jason experienced yet another concussion during practice, which he reported to his team doctor. Although Jason was kept out practice for a couple of weeks, he was cleared to return by the end of September.

111.    At the end of September 2014, Jason experienced yet another concussion, which he reported to his team doctor.

112.    At no point before, during, or after any of these incidents did the NCAA warn Jason of the risks of continuing to play football after sustaining multiple concussions; warn (much less reiterate to) Jason of his increased risk of receiving another concussion in the future;

---

[28]    Josh Schrock, *Jon Gruden 'Still Not Happy' With Vontaze Burfict's 12-Game Suspension*, NBC SPORTS (Oct. 16, 2019), https://bit.ly/2IYJUnD.

inform Jason that his football helmet was not designed with concussion-prevention in mind; or inform him that continuing to play football carried a significant risk of latent brain injury and related symptoms, including but not limited to CTE.

113.    Following college, Jason held odd jobs. However, he became increasingly manic, began experiencing mood swings, had difficulty sleeping, and began to experience delusions of grandeur.

114.    In July 2017, at age 25, Jason moved back to California from Arizona. His deceased grandparents had left him a house in Mar Vista, California, and Jason lived in the house for nearly a year.

115.    Although Jason's condition was already poor, things quickly spiraled out of control. In the Fall of 2017, Jason became fixated on conspiracy theories regarding the Illuminati, culminating in a psychotic episode in which he angrily yelled at his parents and claimed to be Jesus. Then, in April 2018, Jason experienced a psychotic episode during which he believed his parents were trying to kill him. Jason was then hospitalized against his will.

116.    Upon his release in May 2018, Jason effectively absconded back to Arizona, where his condition continued to worsen.

117.    Jason Franklin ultimately committed suicide by hanging in his apartment on July 14, 2018. He was 26 years old.

118.    Subsequently, tissue samples from Jason's brain were sent to Boston University's Chronic Traumatic Encephalopathy Center in Boston, Massachusetts.

119.    In August 2019, a neuropathological assessment of Jason's brain concluded that Jason suffered from Chronic Traumatic Encephalopathy.

120.    During the time Jason Franklin played football at ASU, there were no adequate concussion management protocols or policies in place to address and treat concussions (to say nothing of repetitive sub-concussive impacts) sustained by student-athletes during practice and in games.

121.    In fact, although Franklin sustained repetitive serious blows to the head in

practices and games, the NCAA failed to adopt or implement adequate concussion management safety protocols or return to play guidelines during his time on ASU's football team. Each time Franklin suffered a concussive or sub-concussive hit, Defendant deprived him of the appropriate medical attention and treatment that they knew was necessary to monitor, manage, and mitigate the risks associated with TBIs.

122.    Such changes would have been easy to make and have had profound impacts when implemented.[29]

123.    Had the NCAA disclosed the truth to Jason Franklin, he would have, at minimum, taken more precautions to protect his head and otherwise ensure his safety while playing, and taken more rest following a serious blow to the head, including and especially one resulting in a concussion.

124.    Indeed, had the NCAA been honest with Jason Franklin about the long-term consequences of taking repeated blows to the head while playing football, he would not have continued to play football at all.

125.    As a result of these injuries and the NCAA's failure to adhere to a reasonable duty of care towards Jason Franklin, he experienced psychosis, depression, mood swings, anxiety, loss of concentration, paranoia, suicidal thoughts, and of course, CTE, *all* of which caused and led to Franklin's taking his own life by hanging.

## FIRST CAUSE OF ACTION
### Negligence (Wrongful Death)

126.    Plaintiff incorporates by reference the foregoing allegations.

127.    From its inception and by virtue of its role as the governing body in college athletics, the NCAA has historically assumed a duty to protect the health and safety of all student-athletes at member institutions, including Jason Franklin. The NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its

---

[29]    *See, e.g.*, Lindsay Tanner, *Football Concussion Rates Plummet After One Simple Rule Change, Study Shows*, TIME (Oct. 2, 2018), https://ti.me/2O7pKrg.

players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to its student-athletes.

128.    The duties of Defendant included specific obligations to supervise, regulate, and monitor the rules of the ASU football program, and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to ASU football players, including Jason Franklin.

129.    The NCAA had a duty to educate ASU football players on the proper ways to evaluate and treat TBI during football games and practices, including repetitive sub-concussive and concussive injury. Defendant's duties further included a duty to warn student-athletes of the dangers of sub-concussive and concussive injuries and of the risks associated with football before, during, and after they played college football and as additional information came to light.

130.    The NCAA also had a duty not to conceal material information from ASU football players, including Jason Franklin.

131.    The NCAA breached its duties owed to Jason Franklin by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of concussions on the playing field, in the locker room, and in the weeks and months after he sustained concussions, as well as by failing to provide treatment for the latent effects of concussions. These failings included, but are not limited to:

(a)    failing to adequately recognize and monitor concussive and sub-concussive injuries during football practices and games;

(b)    failing to adequately inform Franklin of the dangers of concussive and sub-concussive injuries;

(c)    failing to adequately design and implement return to play regulations for student football players who sustained concussive and/or sub-concussive injuries and/or

were suspected of sustaining such injuries;

(d)     failing to adequately design and implement procedures to monitor the health of student football players after they sustained (or were suspected of sustaining) concussive and/or sub-concussive injuries;

(e)     failing to adequately warn Franklin about the shortcomings of his football helmet;

(f)     failing to provide adequate, additional protections for Franklin as a member of ASU's "scout team"; and

(f)     failing to adequately provide Franklin notification, warning, and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, after the time he left ASU.

132.    The NCAA breached its duties to Jason Franklin by failing to disclose and/or failing to recognize and/or being willfully non-observant of: (a) material information regarding the long-term risks and effects of repetitive head trauma they possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to football players, including Jason Franklin.

133.    Jason Franklin relied upon the guidance, expertise, and instruction of the NCAA in understanding the risks associated with the serious and life-altering concussive and sub-concussive hits in football.

134.    At all times, Defendant had superior knowledge of material information regarding the effect of repeated traumatic head injuries, including through its institutional knowledge of such effects. Because such information was not readily available to ASU football players, including Jason Franklin, the NCAA knew or should have known that they would act and rely upon the guidance, expertise, and instruction of Defendant on these crucial medical issues while attending ASU and thereafter.

135.    Repetitive TBIs during college football practices and games have a pathological

and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as protein, which is a signature pathology of the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928, and explicitly connected to football by the NCAA itself not long after.

136.    In addition, repetitive concussive and sub-concussive blows to the head can significantly increase a person's risk of developing Alzheimer's disease, especially at an early age, as well as CTE.

137.    Jason Franklin experienced repetitive sub-concussive and concussive impacts during his college football career, which significantly increased his risk of developing neurodegenerative disorders and diseases, including but not limited to CTE and other similar cognitive-impairing conditions. And Franklin did, in fact, develop CTE which—as a secondary consequence—ultimately led him to take his own life.

138.    The repetitive head accelerations, hits, and TBIs to which Jason Franklin was exposed to as an ASU football player presented risks of latent and long-term debilitating chronic illnesses. Absent the NCAA's negligence, the risk of harm to Jason Franklin would have been materially decreased, and Jason Franklin would not have developed CTE and taken his own life.

139.    Thus, as a direct and proximate result of Defendant's negligence, Jason Franklin took his own life.

140.    As a result of its negligence, the NCAA is liable to Plaintiff for the full measure of damages and other relief allowed under applicable law for causing the death of Jason Franklin, including but not limited to the loss of Jason Franklin's care, support, advice, companionship, and moral support.

## SECOND CAUSE OF ACTION
### Negligence (Survival Action)

141.    Plaintiff incorporates by reference the foregoing allegations.

142.    From its inception and by virtue of its role as the governing body in college athletics, the NCAA has historically assumed a duty to protect the health and safety of all student-athletes at member institutions, including Jason Franklin. The NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to its student-athletes.

143.    The duties of the NCAA included specific obligations to supervise, regulate, and monitor the rules of the ASU football program, and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to ASU football players, including Jason Franklin.

144.    The NCAA had a duty to educate ASU football players, including Franklin, on the proper ways to evaluate and treat head injuries during and after football games and practices, including repetitive concussive and sub-concussive injuries. The NCAA's duties further included a duty to warn athletes of the dangers of concussive and sub-concussive injuries and of the risks associated with football before, during, and after they played college football, and as additional information came to light.

145.    The NCAA had a duty not to conceal material information from ASU football players, including Mr. Franklin.

146.    The NCAA breached its duties owed to Jason Franklin by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of concussions on the playing field, in the locker room, and in the weeks and months after he sustained concussions, as well as by failing to provide treatment for the latent effects

of concussions. These failings included, but are not limited to:

(a)      failing to adequately recognize and monitor concussive and sub-concussive injuries during football practices and games;

(b)      failing to adequately inform Franklin of the dangers of concussive and sub-concussive injuries;

(c)      failing to adequately design and implement return to play regulations for student football players who sustained concussive and/or sub-concussive injuries and/or were suspected of sustaining such injuries;

(d)      failing to adequately design and implement procedures to monitor the health of student football players after they sustained (or were suspected of sustaining) concussive and/or sub-concussive injuries;

(e)      failing to adequately warn Franklin about the shortcomings of his football helmet;

(f)      failing to provide adequate, additional protections for Franklin as a member of ASU's "scout team"; and

(g)      failing to adequately provide Franklin notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, after the time he left ASU.

147.    The NCAA breached its duties to student football players, including Mr. Franklin, by failing to disclose and/or failing to recognize and/or being willfully non-observant of: (a) material information regarding the long-term risks and effects of repetitive head trauma it possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to football players, including Mr. Franklin.

148.    As a football player at ASU, Mr. Franklin and those like him relied upon the guidance, expertise, and instruction of the NCAA in understanding the risks associated with serious and life-altering concussive and sub-concussive hits in football.

149.    At all times, the NCAA had superior knowledge of material information regarding the effects of repeated head injuries, including through its institutional knowledge of such effects. Because such information was not readily available to ASU football players, including Mr. Franklin, the NCAA knew or should have known that they would act and rely upon its guidance, expertise, and instruction on these crucial medical issues while attending ASU and thereafter.

150.    Repetitive head impacts during college football practices and games have a pathological and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as protein, which is a signature pathology of the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

151.    In addition, repetitive concussive and sub-concussive blows to the head can significantly increase a person's risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions, especially at an early age.

152.    Student-athletes, including Mr. Franklin, experienced repetitive concussive and sub-concussive impacts during their college football careers, which significantly increased their risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, and Mr. Franklin did, in fact, develop CTE, along with psychosis, depression, mood swings, anxiety, loss of concentration, paranoia, and suicidal thoughts.

153.    The repetitive head accelerations and hits to which student-athletes, including Mr. Franklin, were exposed to presented risks of latent and long-term debilitating chronic illnesses. Absent the NCAA's negligence, the risk of harm to Mr. Franklin would have been materially decreased, and he would not have developed debilitating physical and mental health issues prior to his death.

154.    As a direct result of the NCAA's negligence, prior to the time of his death, Mr.

Franklin incurred economic and non-economic damages in the form of pain and suffering, permanent brain damage, medical costs, nursing home expenses, other out of pocket expenses, lost time, lost earnings, and the loss of enjoyment of life between at least 2017 and the end of his life in 2018. As a result, Defendant is liable to Plaintiff for the full measure of damages allowed under applicable law for causing these harms to Jason Franklin through its negligence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Janice Franklin, as Successor in Interest to Jason Franklin respectfully requests that the Court enter an Order providing for the following relief:

A.    Declare that Defendant's actions, as set out above, constitute negligence and caused the wrongful death of Jason Franklin;

B.    Award all economic, monetary, actual, consequential, compensatory, and punitive damages caused by Defendant's conduct, including without limitation damages for past medical expenses, other out of pocket expenses, lost time and interest, lost earnings, death, and other damages;

C.    Award Plaintiff restitution and/or disgorgement of all monies Defendant has unjustly received as a result of its misconduct alleged herein;

D.    Award Plaintiff reasonable litigation expenses and attorneys' fees;

E.    Award Plaintiff pre- and post-judgment interest, to the extent allowable;

F.    Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff; and

G.    Award such other and further relief as equity and justice may require.


## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**JANICE FRANKLIN**, as Successor in Interest to Jason Franklin, deceased,

Dated: March 18, 2024

By: /s/          Jeff Raizner
*One of Plaintiff's Attorneys*

Jeff Raizner
efile@raiznerlaw.com
RAIZNER SLANIA LLP
2402 Dunlavy Street, Suite 300
Houston, Texas 77006
Tel: 713.554.9099
Fax: 713.554.9098

Jay Edelson*
jedelson@edelson.com
Benjamin H. Richman*
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian*
rbalabanian@edelson.com
Todd Logan*
tlogan@edelson.com
Brandt Silver-Korn*
bsilverkorn@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiff*

*\*Pro hac vice* Admission to be sought.